UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
NATASHA SCHIRALDI,

                Plaintiff,

        -against-

PROHEALTH MEDICAL MANAGEMENT, LLC,
               Defendant.
-------------------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-5956 (OEM) (ST)

**ORELIA E. MERCHANT, United States District Judge:**

Plaintiff Natasha Schiraldi ("Plaintiff" or "Schiraldi") commenced this action against defendant ProHEALTH Medical Management, LLC ("Defendant" or "ProHEALTH") alleging six causes of action: (1) discrimination under Title VII of the Civil Rights Act of 1965 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; (2) retaliation under Title VII; (3) discrimination under 28 U.S.C. § 1981 ("§ 1981"); (4) retaliation under § 1981; (5) discrimination under the New York State Human Rights Law ("NYSHRL"); and (6) retaliation under NYSHRL.  Complaint ("Compl."), ECF 1. Plaintiff seeks declaratory, injunctive, and monetary relief.  *See id.* at 14-15.

Before the Court are Defendant's motion for summary judgment on all of Plaintiff's claims. *see* Defendant's Motion for Summary Judgment ("Def's Mot."), ECF 50, and Plaintiff's motion for partial summary judgment on her federal and state discrimination claims, which are race-based hostile work environment claims, s*ee* Plaintiff's Motion for Partial Summary Judgment ("Pl's Mot."), ECF 54.  For the following reasons, Defendant's motion for summary judgment is **GRANTED,** and Plaintiff's motion for partial summary judgment is **DENIED.**

# BACKGROUND[1]

## A. The Parties

Plaintiff is a biracial woman of Haitian and Italian descent.  Pl's 56.1 ¶¶ 1, 3.  Plaintiff racially identifies as both Black and white.  *Id.* ¶ 2.

ProHEALTH is a subsidiary of Optum Services, Inc. ("Optum"), and UnitedHealth Group, Inc., and operates medical facilities, including blood drafting laboratories, throughout New York City and Long Island.  Def's 56.1 ¶ 1.  ProHEALTH operates a blood drawing laboratory in Bethpage, New York called the Island Medical Group Lab ("Bethpage Lab").  *Id.* ¶ 2.

## B. ProHEALTH's Workplace Policies

ProHEALTH maintains the following workplace policies: (1) an Equal Employment Opportunities policy in its Employee Handbook which explicitly forbids, among other things, discrimination based on several protected classifications, including race, Def's 56.1 ¶ 9; (2) an anti-harassment policy, which prohibits harassment in the workplace based on, among other things, race, and mandates that all employees report instances of alleged discrimination or harassment, *id.* ¶ 10; (3) an anti-retaliation policy, which prohibits retaliation against any employee who, in good faith, reports an alleged violation of the Company's policy prohibiting discrimination or harassment, *id.* ¶ 11; and (4) a Communication in the Workplace policy, which provides, "English will be used when dealing with patients and other clients unless they express a preference for communication in another language."  *Id.* ¶ 18.  In addition, ProHEALTH's Violence Free Workplace policy prohibits any workplace violence or threats of violence against employees or

---

[1]  The following facts are drawn from the parties' respective statements of material facts and are undisputed unless otherwise noted.  *See* Plaintiff's Statement of Undisputed Material Facts ("Pl's 56.1"), ECF 35; Defendant's Statement of Undisputed Material Facts ("Def's 56.1"), ECF 36; Defendant's Counterstatement of Material Facts ("Def's Counter 56.1"), ECF 39; Plaintiff's Counterstatement of Material Facts ("Pl's Counter 56.1"), ECF 40; Plaintiff's Reply 56.1 ("Pl's Reply 56.1), ECF 42; and Defendants' Reply 56.1 ("Defs' Reply 56.1"), ECF 41.

nonemployees, including "[e]nabling or engaging in violent events and/or behavior[,]" and "[p]hysical assault, actual or threatened." *Id.* ¶ 15.

At the time of Plaintiff's hiring in December 2018, new employees like Plaintiff received new hire paperwork, acknowledgments, notices, and reference materials, including ProHEALTH's Employee Handbook and Compliance Manual. *Id.* ¶ 12. Human Resources ("HR") recorded the paperwork, acknowledgments, notices, and reference materials provided to and received from new hires during the new hire orientation process on an internally-maintained New Hire Checklist. *Id.* ¶ 12. Human Resources completed a New Hire Checklist for Plaintiff on December 21, 2018. *Id.* ¶ 13. Plaintiff acknowledged completing ProHEALTH's New Hire Orientation process, which included, among other things, receiving, reviewing, and completing all required new hire paperwork, a Pay Rate notice, supplemental paperwork, and all related reference materials, including, but not limited to, ProHEALTH's Employee Handbook and ProHEALTH's Compliance Manual, which contain ProHEALTH's anti-discrimination, anti-harassment, and anti-retaliation policies. *Id.* ¶ 14. Plaintiff was also aware of and understood ProHEALTH's Violence Free Workplace policy. *Id.* ¶ 16.

### C. Plaintiff's Employment at ProHEALTH

Plaintiff worked as a phlebotomist at Defendant's Bethpage Lab. *Id.* ¶ 3. As a phlebotomist, Plaintiff, among other things, drew blood, and collected other specimens from patients at the Bethpage Lab. *Id.* ¶ 5.

Plaintiff first worked at the Bethpage Lab as a temporary worker employed by the Lloyd Staffing Agency, who placed her at the Bethpage Lab as a phlebotomist from about July 2018 through December 2018. *Id.* ¶ 6. On or about December 2018, Plaintiff applied to be a permanent employee of ProHEALTH, and on December 21, 2018, ProHEALTH hired Plaintiff directly for a

permanent position.  Plaintiff remained employed as a phlebotomist at the Bethpage Lab until her employment was terminated on October 5, 2020.  *Id.* ¶ 7.

During Plaintiff's employment with ProHEALTH, she worked on a team of phlebotomists at the Bethpage Lab, which included the following ProHEALTH personnel: phlebotomists Lisa DeSantis ("DeSantis"), Erline Dorsainvil ("Dorsainvil"), and Maria Giordano ("Giordano"); and Melissa Heath ("Heath"), one of Plaintiff's supervisors.  Pl's 56.1 ¶ 26.

Plaintiff's initial direct supervisor at the Bethpage Lab was Michael Minerva ("Minerva"). *Id.* ¶ 10.  Minerva is a white male.  *Id.* ¶ 30.  In or around November 2019, Minerva was transferred to Optum's offices at Lake Success, New York.  Def's 56. 1 ¶ 32.  Minerva separated from ProHEALTH on July 31, 2020.  *Id.* ¶ 33.

Starting in the summer of 2020, Plaintiff reported to a new management team.  Plaintiff reported directly to Sashomie McLeod Powell ("McLeod"), a Phlebotomist Supervisor.  McLeod in turn reported to Nilsa Banks, formerly a Lab Manager and currently a Laboratory and Point of Care Lab Manager.  Def's 56.1 ¶ 35.

Plaintiff's employment with ProHEALTH was terminated on October 5, 2021.  Pl's 56.1 ¶ 168; Def's 56.1 ¶ 170.

### D. Discriminatory Conduct

Plaintiff alleges that Minerva "regularly engaged in racist, discriminatory conversations with Plaintiff's co-workers in the lab."  Pl's 56.1 ¶ 34.  Specifically, Plaintiff's workplace complaints center on incidents where Minerva "made [] racially demeaning comments or 'jokes' in the lab" with co-workers.  Pl's 56.1 ¶¶ 20, 39; Affidavit of Natasha Schiraldi ("Schiraldi Aff.") ¶ 17, ("Minerva regularly made "jokes" and engaged in commentary that was racially derogatory

against [Schiraldi] and others who are not white."), ECF 42-2; *see also id.* ¶ 28.  Defendants dispute this occurred.  *See* Def's Counter 56.1 ¶ 36.

Plaintiff also alleges that her co-worker DeSantis "frequently made racially offensive comments towards [] Plaintiff, often specifically focused on Plaintiff being biracial."   Pl's 56.1 ¶ 56; *see* Schiraldi Aff. ¶¶ 17-18 (stating DeSantis was "extremely hostile" to Plaintiff "because [Plaintiff] was biracial.").  Defendants dispute this.  *See* Def's Counter 56.1 ¶ 56.

Plaintiff declares that "the way [her] co-workers spoke about and treated non-white patients made [her] feel devalued in the workplace as a Black woman."  Schiraldi Aff. ¶ 28.

### 1. Plaintiff's Supervisor Minerva

Plaintiff sets forth the following facts related to her hostile work environment claims concerning Minerva.

#### a. Plaintiff's Interview

In the fall of 2018, Minerva was given a list of phlebotomy candidates from ProHEALTH to potentially hire.  Minerva then selected Plaintiff for an interview and subsequently interviewed her both by phone and in person.  Pl's 56.1 ¶ 10; Def's Counter 56.1 ¶ 10.  Plaintiff asserts that Minerva told her that the only reason she received the initial call for an interview from Minerva was because Minerva thought she was white.  Pl's 56.1 ¶ 22 (citing Deposition of Sashomie McLeod ("McLeod Dep.") 135:15-21, ECF 35-2).  Minerva disputes that this is the reason he called Plaintiff for an interview.  Minerva recalled that when he heard Plaintiff's name, Schiraldi, he thought she might have been Italian, Russian, or Eastern European but states that he was unaware of Schiraldi's actual race before selecting her for an interview.  Def's 56.1 ¶ 20 (citing Declaration of Michael Minerva ("Minerva Decl.") ¶ 4, ECF 36-5).  Further, Minerva avers that race played no role in Schiraldi's selection or hire.  *Id.* (citing Minerva Decl. ¶ 4).

Plaintiff asserts that in her interview that Minerva "expressed surprise when he saw her," and told her that, "I was expecting to see someone who was white." Pl's 56.1 ¶ 22. Minerva denies that he stated any such expectation or surprise at their interview, but that, in fact, it was Plaintiff who said to him, "I bet you were surprised when I showed up." *See* Def's Counter 56.1 ¶ 22 (citing Deposition of Michael Minerva ("Minerva Dep.") 157:24-159:11, ECF 36-11). However, in her affidavit, Plaintiff recasts this as Minerva saying: "I was expecting to see someone who was Russian or Italian." Schiraldi Aff. ¶ 7. Minerva disputes making such a remark, alleging that it was Schiraldi who first raised the issue of race with him by bringing up her racial and ethnic background during the interview. *See* Def's Counter 56.1 ¶ 22 (citing same).

### b.  Race-based Statements and Comments

### 1)  DNA/Ancestry Tests Comment

Minerva admits that on a single occasion, he surmised to Plaintiff and others that he believed his wife did not want to take a DNA ancestry test because she feared discovering that she was Black or otherwise had Black ancestry. Def's 56.1 ¶ 84; Pl's 56.1 ¶ 42; *see* Deposition of Natasha Schiraldi ("Schiraldi Dep.") 175:2-24, ECF 36-10. Minerva asserts that his wife never actually made such a statement but rather it was his belief as to what he thought his wife would think about taking an ancestry test. *See* Minerva Dep. 220:11-14. Minerva maintains that this comment "was said in a clearly jestful[sic] manner to [Plaintiff]," *id.*, and that the views of his wife did not influence the way he managed employees at the Bethpage Lab. Def's 56.1 ¶¶ 84, 86. Plaintiff testified that this exchange occurred in the back of the Bethpage Lab but was unsure if it was directed to her specifically. Schiraldi Dep. 172:6-13, 176:9-177:21. Plaintiff felt that this statement made "it seem[] like there [wa]s something wrong with being Black." *Id.* 177:12-14.

6

Schiraldi did not document or report the incident to a supervisor or HR at the time.  Schiraldi Dep. 181:19-20; Plaintiff's Counter 56.1 ¶ 84.

### 2)  Cooking Comment

Plaintiff asserts that on one occasion, after the January 2020 tow sticker incident, *see infra* Part D(3), Minerva made a comment "in general" in front of Plaintiff and others that his wife could not cook so "she must be Black."  Pl's 56.1 ¶ 45 (citing Schiraldi Dep. 164:17-165:25).  Minerva admits that he regularly discussed his wife's cooking at work but disputes that he ever made this specific statement.  Def's Counter 56.1 ¶ 45; *see* Minerva Dep. at 221:6-9.

### 3)  Race Guessing Game

Plaintiff also relates that Minerva and other unspecified other employees would play, at unspecified times, a game where they would "guess the race of a person who came into the lab" based on their appearance.  Pl's 56.1 ¶ 36 (citing Minerva Dep. 111:12-112:3).  Similarly, Plaintiff claims that Minerva would try and guess people's country of origin and citizenship status.  *Id.* ¶ 37 (citing Minerva Dep. 154:14-155:11).  Minerva does not dispute engaging in these guessing games but maintains that the guessing games were never directed towards or referred to Schiraldi specifically.  *See* Def's Counter 56.1 ¶¶ 34 (citing same), 37, 84.  Further, Minerva contends that Schiraldi was not present during these games.  Def's Counter 56.1 ¶ 34.

### 4)  MLK Day Fried Chicken Comment

Further, Plaintiff states that Minerva discussed with "other people" that he would observe Martin Luther King, Jr. Day ("MLK Day") by eating fried chicken and chocolate because he "would try to eat the type of food that [he] thought Martin Luther King Jr. would eat."  Pl's 56.1 ¶ 41 (citing Minerva Dep. 113:17-114:1).  Minerva admits making this statement.  *See id.*

### b.  Religious Statements

Minerva also admits that he and unspecified others spoke about "Arab women" at work at some point in time while Minerva was stationed at the Bethpage Lab.  Pl's 56.1 ¶ 38.  Moreover, Minerva discussed with unspecified people whether certain patients were Muslim and the fact that some Muslim women had to wear veils.  Minerva Dep. 115:17-116:4.  Minerva also expressed a belief that such women "were mistreated."  *See id.*

### 2.  HIV Script Reading Incident

A phlebotomist's job duties include reviewing and interpreting prescriptions or "scripts" written by healthcare providers directing phlebotomists to perform certain lab examinations, including blood draws to test for the human immunodeficiency virus ("HIV").  Def's 56.1 ¶ 52.  A prescriptions either lists the specific code for the lab examination or provides a description of the required lab examination.  *Id.* ¶ 53.

In or around December 2018, Plaintiff was assisting a Black patient with a prescription.  *See* Declaration of Erline Dorsainvil ("Dorsainvil Decl.") ¶ 4, ECF 36-4.  According to Plaintiff, while supervisor Heath was training her, Plaintiff was holding a paper script for an HIV test which did not have a code on it.  At some point Heath said the words "HIV" out loud repeatedly in front of both the Black patient and Plaintiff, causing the patient to become embarrassed.  Pl's 56.1 ¶¶ 27-31; *see* Schiraldi Dep. 30:7-35:25.  Plaintiff was also "mortified" and believed that Heath engaged in the "harassing behavior" only because the patient was Black.  Pl's 56.1 ¶ 31.  Plaintiff believes that this was intentional because she believes Heath had memorized the prescription codes and thus could have instead used the numeric code rather than stating HIV out loud.  *See* Pl's Counter 56.1 ¶¶ 54-55.  ProHEALTH maintains that the script was unclear to the patient and that the patient himself asked Plaintiff and Dorsainvil, who was present during the incident, whether

the script was for an HIV test because that was the test he wanted.  Def's 56.1 ¶ 55; *see* Dorsainvil Decl. ¶¶ 4-5.

Dorsainvil declares that she did not find Heath's conduct offensive or discriminatory based on race.  Dorsainvil Decl. ¶ 4.  Dorsainvil also states that she never witnessed Heath discriminate against or otherwise treat any patients poorly based on race.  *Id.* ¶ 8.  However, Plaintiff testified that she and Dorsainvil would "talk about it all the time" and that it was "often because we both know it was wrong."  Pl's Counter 56.1 ¶ 58.  Plaintiff did not report this HIV script incident at that time to HR or Minerva or to anyone else at ProHEALTH before she was terminated.  Def's 56.1 ¶ 59.  Yet, Plaintiff claims she later told McLeod about the incident during her termination call.  Pl's Counter 56.1 ¶ 59.

### 3.  The January 2020 Tow Sticker Incident

The Bethpage Lab is located in a strip mall which shares a parking lot with neighboring businesses and government offices, including a New York State Department of Motor Vehicle ("DMV") office.  Def's 56.1 ¶ 60.  As such, Bethpage Lab employees park in the same lot as customers or visitors to neighboring businesses and government offices.  *Id.*

On or around January 30, 2020, Plaintiff saw a "tow-away" sticker on the windshield of her car, which was parked in the shared parking lot at the Bethpage Lab.  *Id.* ¶ 61.  The sticker itself read "FINAL VIOLATION.  YOUR VEHICLE IS ILLEGALY [SIC] PARKED.  IT WILL BE TOWED" but did not otherwise contain any contact information for the person who placed it on Plaintiff's car, and it did not contain any official markings of any local or state police department or government entity.  Def's 56.1 ¶ 62; Pl's Counter 56.1 ¶ 62.  Afraid of having her car towed, Plaintiff left work early and drove her car home.  Pl's 56.1 ¶¶ 74-75.  On her way home Minerva called Plaintiff on her cellphone and asked her why she had left work,.  *Id.*  Plaintiff explained her

9

discovery of the sticker on her car and told Minerva that she feared the police were going to tow her car which would interfere with Plaintiff's ability to pick up her children from school.  *Id.* ¶ 76. Minerva asked Plaintiff to text him a picture of the sticker, which she did.  Def's 56.1 ¶ 67.

Minerva asked Heath, his assistant supervisor, if Heath had seen or heard of any other ProHEALTH employees getting ticketed in the shared parking lot.  *Id.* ¶ 70.  Heath did not know who put the tow sticker on Plaintiff's car but suggested that a building manager, who was not a ProHEALTH employee, might have placed the sticker on Plaintiff's car.  *Id.*  Minerva determined that the sticker was "bogus" and fake and told Plaintiff the same. *Id.* ¶ 72; *see S*chiraldi Dep.  91:7-9.  Minerva assumed the sticker was placed on Schiraldi's car as a "joke from someone" or "something that somebody did for no official reason."  Def's Counter 56.1 ¶ 81 (citing Minerva Dep. 120:18-121:7,133:21-134:3.).  According to Plaintiff, Minerva told her that he believed that the sticker was placed on Plaintiff's car by a ProHEALTH worker who wanted to be a vigilante and who believed that Plaintiff was an immigrant.  Pl's Counter 56.1 ¶ 72; *see* Schiraldi Dep. 88:11-18.   Minerva disputes saying such a thing to Plaintiff during their conversation. Def's 56.1 ¶ 72 (citing Minerva Dep. 140:18-141:7, 147:24-148:15).

### 4.  Plaintiff's Interactions with Co-Worker DeSantis

#### a. Racial Comments

##### 1)  Biracial TV Show Comment

While at work sometime between January 2020 and June 29, 2020, DeSantis, Dorsainvil, and Plaintiff were discussing a television show that featured the experiences of biracial children. Def's 56.1 ¶ 88.  Dorsainvil recalled that during the conversation DeSantis asked Plaintiff whether Plaintiff "had experienced anything like that; any horrible experience . . . like that?"  *Id.* (citing Dorsainvil Dep. 75:7-77:14).  Dorsainvil recalled that Plaintiff was upset and asked her: "Can you

believe she [DeSantis] said that."  Dorsainvil Dep. 76:1-77:17.  However, Dorsainvil, who identifies as Haitian, did not understand why Plaintiff was upset and did not take personal offense to the remark.  *See* Def's Counter 56.1 ¶¶ 89-90; Dorsainvil Dep. 76:1-77:17.

### 2)  "Freak of Nature" Comment

Plaintiff alleges that on another unspecified time after January 2020, Plaintiff was sitting at a desk in the front of the Bethpage Lab when DeSantis called Plaintiff a "freak of nature" and told her that she "must have grown up messed up" and that DeSantis "did not believe in mixing two cultures" while in the Bethpage Lab.  Pl's 56.1 ¶ 57; *see* Schiraldi Dep. 107:4-110:19. Defendant disputes this occurred.  Def's Counter 56.1 ¶ 57 (citing Declaration of Lisa DeSantis ("DeSantis Decl.") ¶ 6, ECF 36-3).  Plaintiff recalled Dorsainvil also being present for the conversation and sitting at a desk at the front of the Bethpage Lab.  Schiraldi Dep. 109:22-110:23. However, Dorsainvil did not recall ever hearing the phrase "freak of nature" being used in the workplace.  Def's Counter 56.1 ¶ 57.

### 3) MLK Day Comment

Plaintiff additionally alleges that, at an unspecified time in 2019, Plaintiff overheard DeSantis say to an unspecified patient that "[t]hey have Martin Luther King Day.  What's that about?"  Def's 56.1 ¶ 59.  Schiraldi admits that she only overheard the comment as she was outside the exam room the patient was in and that the comment was not directed to her.  *See* Pl's counter 56.1 ¶ 103 (citing Schiraldi Dep. 133:18-24; 134:8-137:9).  DeSantis avers she has a favorable opinion of both Dr. Martin Luther King, Jr. and the Dr. Martin Luther King, Jr. Day holiday.  Def's 56.1 ¶ 105.

### c. Alleged COVID-19 Exposure & ProHEALTH's Response

Plaintiff also alleges that at some point after March 2020, shortly after the COVID-19 pandemic begun, Plaintiff was concerned about contracting COVID-19.  Def's 56.1 ¶ 109.

In or around March 2020, DeSantis' husband was directed to stay home due to potential COVID-19 exposure at his place of work.  Pl's 56.1 ¶ 110.  However, DeSantis' husband was not given a quarantine order, and Plaintiff was unaware if DeSantis' husband was diagnosed with COVID-19.  *Id.* ¶¶ 110, 112.  Further, DeSantis herself was never diagnosed with COVID-19 while employed at ProHEALTH.  DeSantis Decl. ¶ 13.

Plaintiff alleges that DeSantis "taunted" her at work by bumping into her at the Bethpage Lab and that, on one occasion, DeSantis approached Plaintiff and purposely coughed on her such that DeSantis' saliva came in contact with Plaintiff's body.  *See* Pl's 56.1 ¶¶ 92-96.  Plaintiff states that she told DeSantis to "get away from her" and that this warning was witnessed by another white supervisor, Karen Ragozzino ("Ragozzino").  Def's 56.1 ¶ 116.  Ragozzino was not Plaintiff's actual manager or supervisor.  Def's Counter 56.1 ¶ 171.

Plaintiff perceived DeSantis' course of conduct in the lab as physically threatening and targeted towards her "because of [DeSantis' purported] racial animus."  Pl's 56.1 ¶ 97.  That is, Plaintiff testified to believing that DeSantis "would not do that to . . . anyone else" and she would not have done it to Plaintiff "if [Plaintiff] was White."  Schiraldi Dep. 224:5-8.  Rather, Plaintiff believed DeSantis coughed on her "because of who" Plaintiff was, *i.e.*, a biracial Black woman. *Id.*  Yet, Plaintiff also testified that she did not believe that DeSantis came to work specifically to infect her or other Black people in the workplace.  Schiraldi Dep. 214:16-22.

Plaintiff first reported the coughing incident to a supervisor, Heath, who replied that it was "fine" because DeSantis did not have COVID-19.  Pl's 56.1 ¶ 98.  Plaintiff states that Minerva

subsequently called a meeting between Plaintiff, DeSantis, and himself.  Pl's 56.1 ¶¶ 101-04.  At

the meeting, DeSantis allegedly told Plaintiff: "If I wanted to come after you, I would come after

you."  *Id.*  Plaintiff recalled at her deposition that Minerva asked Plaintiff whether she felt

threatened by DeSantis.  Pl's 56.1 ¶¶ 101-04.  Plaintiff answered affirmatively, citing DeSantis'

physical size.  *Id.*  Plaintiff also maintained that she "definitely" called DeSantis a racist during

the meeting.  *Id.*; *see* Schiraldi Dep. 244:17-18.  Minerva recalls having held a meeting between

the two employees but did not recall these details as recounted by Schiraldi.  Def's Counter 56.1

¶¶ 101, 104-05.

Plaintiff left the meeting and sought the assistance of supervisor Deborah Vathis ("Vathis").

Pl's 56.1 ¶ 105.  Plaintiff explained to Vathis she had come from a meeting with Minerva, related

to Vathis what was happening between her and DeSantis, and further that she felt as if she was

being racially? harassed.  In addition, Plaintiff voiced concerns about masking and COVID-19.

Pl's 56.1 ¶¶ 105, 107, 109.  Plaintiff also related the tow sticker incident to Vathis.  *Id.*

Plaintiff alleges that Vathis said DeSantis' conduct "sounded like teasing."  Pl's 56.1 ¶ 107.

The parties agree that Vathis responded by telling Plaintiff she would speak to DeSantis as well as

ProHEALTH staff about wearing face masks in light of COVID-19.  Def's 56.1 ¶ 117.

ProHEALTH claims that, at the time of this conversation with Vathis, Plaintiff did not raise

any issues related to race discrimination or retaliation  Def's 56.1 ¶ 118.  According to Plaintiff,

Plaintiff believed she was making complaint because she believed that the notice was purportedly

put on her car because the perpetrator thought she "was an immigrant."  Pl's Counter 56.1 ¶ 118.

Plaintiff did not contemporaneously report the incident to HR and neither did Minerva.  Def's 56.1

¶ 74; Pl's Counter 56.1 ¶ 74.  Plaintiff later reported the sticker incident in September 2020 during

her termination call.  Pl's Counter 56.1 ¶ 74.

**E. Plaintiff's Conversation with Supervisor McLeod and McLeod's Discussions with Supervisor Banks**

Starting in the summer of 2020, Plaintiff reported to a new management team and thereafter reported directly to McLeod.  McLeod is a Black woman.  *Id.* ¶ 37.

McLeod was the first point of contact for the phlebotomists at the Bethpage Lab but rotated between Bethpage and nine other labs to which she was assigned.  *Id.* ¶ 35.  Mcleod in turn reported to Nilsa Banks.  *Id.*  Banks, who is Hispanic, was responsible for supervising the operations of five Labs including the Bethpage Lab but did not work out of the Bethpage Lab.  *Id.* ¶ 38.

Approximately a few weeks after McLeod took over as Plaintiff's direct supervisor in 2020—and two years after Minerva's alleged comments about expecting someone white to show up for Plaintiff's interview—Plaintiff told McLeod about Minerva's comments.  Pl's 56.1 ¶ 25; *see* McLeod Dep. 134:22-25, 135:17-21.  McLeod understood Plaintiff's comments as Plaintiff simply expressing an opinion that Minerva was "racist" and not that Plaintiff was lodging a formal workplace complaint against Minerva.  *See* McLeod Dep. 134:10-25, 149:11-21.

However, McLeod orally reported this conversation to Banks, her supervisor.  Def's 56.1 ¶ 122; *see also* McLeod Dep. 138:23-139:18.  Given that Minerva was no longer at the Bethpage Lab at that time, neither McLeod nor Banks further reported the incident to ProHEALTH's HR department.  Banks told McLeod to "[j]ust be sensitive of [Plaintiff's] complaints and let's see if she, you know, raises any more issues along those lines of, you know, discrimination, and then we could take action."  McLeod Dep. 139:12-18.

Plaintiff states that in another separate conversation with McLeod, at some unspecified later time, Plaintiff called Minerva and Heath "racists"; however, in McLeod's recollection, Plaintiff simply mumbled to her "you know, white people."  Def's 56.1 ¶ 121; *see* McLeod Dep.

147:25-148:24, 150:2-4, 158:18-20.   Nonetheless, after hearing Plaintiff say this, McLeod followed up with Plaintiff, and asked if she felt threatened by Minerva, to which Plaintiff responded "no."  McLeod Dep. 147:17-24.  McLeod testified that Plaintiff did not make any further complaints or comments about discrimination thereafter.  Def's 56.1 ¶ 124; *see* McLeod Dep. 148:23-149:5.

Plaintiff also states that she related the coughing incident with DeSantis to McLeod "months later" after it happened.  Schiraldi Dep. 261:10-23.  McLeod denies this occurred.  McLeod Dep. 160:15-18.

### F.  September 2020 Incident with DeSantis

On September 29, 2020, DeSantis arrived at the Bethpage Lab for work at 7:18 a.m. and Giordano, another ProHEALTH employee, arrived at the Bethpage Lab for work at 7:26 a.m.  Def's 56.1 ¶¶ 126-27.  Plaintiff arrived at the Bethpage Lab for work at 7:30 a.m.  *Id.* ¶ 128.  Dorsainvil arrived at the Bethpage Lab for work approximately two hours later at 9:24 a.m.  *Id.* ¶ 129.  McLeod was not scheduled to work at or visit the Bethpage Lab on September 29, 2020, and was not physically present at the Bethpage Lab in the morning.  *Id.* ¶ 130.  McLeod and Banks were Plaintiff's direct supervisors that day.  Schiraldi Dep. 299:5-8.

At some point, Plaintiff and DeSantis argued about workflow and the proper way to collect patients' scripts.  Pl's 56.1 ¶ 125; Def's 56.1 ¶ 131.  Plaintiff was collecting scripts from all patients in the waiting room at once and then calling them up one-by-one to have their specimens collected.  Def's 56.1 ¶ 132.  DeSantis disagreed with this approach and believed patients should check in one-by-one and wait to be called up with their scripts individually.  *Id.*  Plaintiff told DeSantis the procedure at the lab had changed while DeSantis was out of the office for three months in 2020 on Family and Medical Leave Act ("FMLA") leave, that DeSantis was now collecting scripts

improperly, and that DeSantis could collect scripts in whichever way she preferred.  *Id.* ¶ 133.
Giordano was a witness to this verbal argument between Plaintiff and DeSantis, which took place
at approximately 7:30 a.m.  Def's. 56.1 ¶ 135.

According to Plaintiff, when Dorsainvil later arrived at Bethpage Lab, Plaintiff related the
earlier argument with DeSantis to Dorsainvil in confidence.  Plaintiff explained the incident to
Dorsainvil and shared that she felt it was inappropriate that the argument occurred in front of
patients.  Schiraldi Dep. 312:22-:313:9.

However, according to Dorsainvil, shortly after she arrived at the lab, DeSantis approached
Dorsainvil to discuss the proper procedure for collecting and processing patients, and before
Dorsainvil could answer, Plaintiff interjected and stated that DeSantis' view was incorrect, and that
everyone should just collect scripts in the way they preferred.  Def's 56.1 ¶ 136.  At this point,
DeSantis and Plaintiff commenced arguing and "going back and forth" again.  Dorsainvil Dep.
275:9-23.  Dorsainvil recalled that she heard Plaintiff say, "I let you slide the last time without
putting my hands on you, this time I will knock you out."  Def's 56.1. ¶ 138.  Plaintiff alleges that
this second argument occurred in front of patients and that DeSantis angrily threw papers all over
the desk.  Pl 56.1 ¶ 129; Schiraldi Dep. 317:18-22.

At approximately 10:00 a.m., Plaintiff called McLeod from her cellphone and told her
about the paper-throwing incident, her argument with DeSantis about the script workflow, and
shared that DeSantis "came after her."  Pl's 56.1 ¶ 136; Pl's Counter 56.1 ¶ 141; Def's 56.1 ¶ 141.
Plaintiff did not relate to McLeod that she had suffered any threats of physical violence or racial
discrimination.  Def's 56.1 ¶ 141.

In response, McLeod informed Plaintiff that she would come to the Bethpage Lab to
discuss the issue with the Phlebotomy Team.  Def's 56.1 ¶ 142.  McLeod informed Banks of

Plaintiff's complaint regarding script procedure.  *Id.*  A few minutes later, McLeod received a phone call from DeSantis, who had left Bethpage Lab for a scheduled medical appointment.  Def's 56.1 ¶ 143.  McLeod recalled that DeSantis was "crying and frantic" and told her that she did not feel safe and that "[Plaintiff] threatened to punch her out."  *Id.*; McLeod Dep. 175:6-176:3.

Initially, DeSantis refused to return to the office because she believed Plaintiff's threat was genuine given Plaintiff's demeanor and tone during the argument.  Def's Counter 56.1 ¶ 138. McLeod, however, instructed DeSantis to return to the Bethpage Lab so that she could collect more information regarding her complaint.  Def's 56.1 ¶ 144.  McLeod then reported DeSantis' complaint of Plaintiff's workplace threat to Banks and went to the Bethpage Lab.  *Id.*¶ 145.

## G.  Management's Response to the September 2020 Incident

Shortly thereafter, McLeod notified Lina Giambalvo ("Giambalvo"), HR Generalist, of DeSantis' complaint of workplace violence.  Giambalvo contacted McLeod via telephone and instructed her to collect statements from potential witnesses and provide the statements to HR. Def's 56.1 ¶ 146.

When McLeod arrived at the Bethpage Lab, she instructed DeSantis, Dorsainvil, Giordano, and Plaintiff to type out written incident statements describing the incident.  *Id.* ¶ 147; Pl's 56.1 ¶ 137.  McLeod also spoke with each phlebotomist at the Bethpage Lab regarding the incident. Dorsainvil told Powell that she heard Plaintiff state, "I let you slide the last time without putting my hands on you, this time I will knock you out."  Def's 56.1 ¶ 149.  McLeod collected the typed-out incident statements from DeSantis, Dorsainvil, Giordano, and Plaintiff, and provided them to Giambalvo via email on September 29, 2020.  Def's 56.1 ¶ 148.

Immediately upon notification of DeSantis' complaint of alleged threats of violence, ProHEALTH HR initiated an investigation.  Def's 56.1 ¶ 150.  Giambalvo and Lisbeth Teemsma,

Director of Human Resources, were the sole investigators.  *Id.*  As part of this investigation, HR interviewed Giordano, DeSantis, and Dorsainvil, but did not interview Plaintiff.[2]  *See* Pl's Counter 56.1 ¶ 151.

In Dorsainvil's initial telephone interview with Giambalvo, she confirmed that Plaintiff stated, "I let you slide the last time without putting my hands on you, this time I will knock you out."[3]  Def's 56.1 ¶ 152.  Giordano was unable to confirm Plaintiff's comment during her interview with Giambalvo.  *Id.* ¶ 153.

After conducting interviews with Dorsainvil and Giordano, Giambalvo partnered with Teemsma, and interviewed Plaintiff for the first time, and DeSantis and Dorsainvil once more.  *Id.* ¶ 154.

DeSantis confirmed to HR that she genuinely perceived Plaintiff's statement as a threat, and stated that she did not feel safe going to work with Plaintiff in the Bethpage Lab.  *Id.* ¶ 155; *see* September 29, 2020, Memorandum to File of Lina Giambalvo ("LG Memo") at 24-29, ECF 36-12.

 Teemsma then got in contact with Plaintiff and informed her that she was accused of threatening DeSantis.[4]  Pl's 56.1 ¶ 144.  During Plaintiff's witness interview with HR, she related that she previously had issues with DeSantis, namely the coughing incident.  However, Plaintiff did not raise any complaints of discrimination or retaliation.  Def's 56.1 ¶ 156; Deposition of Lina

---

[2]  Heath also stated she was not present during the incident.  Pl's 56.1 ¶ 140.

[3]  Plaintiff disputes this on the ground that Teemsma "admitted [during her Deposition] that based on [Maria] Giordano's witness statement, she would believe that Dorsainvil was not present at the time of the incident."  *See* Lisabeth Teemsma Deposition 101:15-102:4, ECF 35-2.  However, Teemsma's belief as to Dorsainvil's absence was based on another witness' hearsay statement and is directly controverted by Dorsainvil's own statements and other corroborating evidence.  *See* Def's Reply 56.1 ¶ 152.

[4]  Teemsma did not know Plaintiff's racial identity during the HR investigation or before HR recommended that the lab terminate Plaintiff.  Def's 56.1 ¶ 163.  While Plaintiff counters that Teemsma could have known her race from Plaintiff's "Voluntary Self Identification Form," Plaintiff provides no evidence in support of this bald assertion.  Accordingly, this fact is accepted as undisputed.

Giambalvo ("Giambalvo Dep.") 272:11-22, ECF 36-11.   Teemsma concluded the conversation with Plaintiff by letting her know that she and Giambalvo were conducting an investigation solely about workplace violence.   Giambalvo Dep. 272:11-22.   After Plaintiff's interview, HR notified Plaintiff that she was placed on paid suspension pending the results of the investigation.   Def's 56.1 ¶ 157; Pl's 56.1 ¶ 146.

Giambalvo and Teemsma again called Dorsainvil and obtained another statement from her. LG Memo at 5.   In Dorsainvil's second witness interview, she again confirmed that Plaintiff stated, "I let you slide the last time without putting my hands on you, this time I will knock you out." Def's 56.1 ¶ 159.

Teemsma asked Dorsainvil if she had ever witnessed Plaintiff make any threats of violence to other employees before.   To Teemsma it appeared that Dorsainvil "seemed hesitant to answer at first." LG Memo at 5.   When Dorsainvil was asked again if she had witnessed this type of behavior from Plaintiff before with any other employee, Dorsainvil replied, "Yes," and stated that the other employee was in fact herself.   Def's 56.1 ¶ 160; *see* LG Memo at 5.

HR's investigation and findings were compiled into an investigation memorandum written by Giambalvo.   Pl's 56.1 ¶ 161; Request for Termination dated October 1, 2020 ("Termination Memo"), ECF 36-11.

Pursuant to ProHEALTH practices and procedures, ProHEALTH required that the Vice President of Human Capital for Optum review the circumstances of and approve Human Resources' recommendations for employment termination for ProHEALTH employees.   Def's 56.1 ¶ 165.   The Vice President of Human Capital for Optum was Debra Bierman ("Bierman"). *Id.*   Based on HR's investigation, Giambalvo and Teemsma recommended to Bierman that ProHEALTH terminate Plaintiff's employment.   *Id.* ¶ 166.   October 5, 2020, Bierman approved

the termination of Plaintiff's employment based on the HR investigation, which determined that Plaintiff violated ProHEALTH's Violence Free Workplace policy by threatening physical violence against DeSantis on September 29, 2020. *Id.* ¶ 167. DeSantis, Dorsainvil, Powell, and Banks did not have any input as it related to the decision to terminate Plaintiff's employment. *Id.* ¶ 168.

At the time Bierman made the recommendation to terminate Plaintiff's employment, Bierman was unaware of Plaintiff's race or DeSantis' race and was unaware of any purported complaints raised by Plaintiff regarding her co-workers or discrimination. Def's 56.1 ¶ 169; *see also* Def's Reply 56.1 ¶ 169.

On October 5, 2020, Plaintiff was informed by Teemsma and Giambalvo via telephone of ProHEALTH's decision to terminate her employment. Def's 56. ¶ 170. During Plaintiff's October 5, 2020, telephone call with Teemsma and Giambalvo, Plaintiff stated that she had complained to supervisors Vathis, Ragozzino, and Minerva regarding purported past threats of violence made against her during her employment. *Id.* ¶ 171. Plaintiff also claims she relayed DeSantis' "freak of nature comment" and that DeSantis had said "certain racist things to" her. Schiraldi Dep. 331: 4-16. However, Plaintiff's allegation that she said this is not elsewhere supported in the record.

HR then investigated the allegations of threats of violence made against Plaintiff by separately interviewing Vathis, Ragozzino, and Minerva. *See* Def's 56.1 Reply ¶ 172. Minerva did not recall anything; Ragozzino only recalled being a witness to an incident months prior between DeSantis and Plaintiff described as "a yelling thing." Vathis stated that Plaintiff never raised concerns to her about threats of violence, but that she had heard from Minerva, not Plaintiff, about an incident of a "note" taped on Plaintiff's car and that Plaintiff had expressed feeling threatened; Vathis also confirmed discussing the issue of proper masking with ProHEALTH staff. LG Memo at 6; *accord* Giambalvo 314:11-19 (confirming that Giambalvo's notes in the LG Memo

were accurate).  HR's investigative report was updated with its findings regarding Plaintiff's post-termination complaint of alleged threats of workplace violence made to her.  Def's 56.1 ¶ 173. The record does not show that HR investigated any race-based based complaints.

## STANDARD OF REVIEW

In cases where "both sides move for summary judgment, the district court is required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Williams v. N.Y. City Dep't of Health & Mental Hygiene*, 299 F. Supp. 3d 418, 424 (S.D.N.Y. 2018) (internal citation omitted).  Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal citations omitted).  "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein*, 996 F.2d at 1461 (internal quotation marks and citations omitted). Conclusory statements, conjecture, or speculation by the party seeking summary judgment will not justify the grant of summary judgment.  *Hayes v. Cablevision Sys N.Y. City Corp.*, 2012 WL 1106850, at *7 (E.D.N.Y. Mar. 31, 2012).

**DISCUSSION**

### A.  Plaintiff's Hostile Work Environment Claims

While Plaintiff alleges race-based discrimination under federal and state law,[5] Plaintiff moves for summary judgment based on the theory that she was subjected to a hostile work environment at ProHEALTH rather than discrimination premised on disparate treatment. Plaintiff's Memorandum in Support of Partial Summary Judgment ("Pl's Memo") at 3, 11-14 (arguing that "Plaintiff's work environment was permeated with racially disparaging conduct"), ECF 54-1; Compl. ¶ 69 (alleging a "pervasive racially hostile work environment that permeated the workplace at Defendant PROHEALTH").  A hostile work environment claim is analyzed under different standards than disparate treatment claims.  *See Desouza v. Off. of Child. & Fam. Servs.*, 18-CV-2463(PKC)(SMG), 2019 WL 2477796, at *4 (E.D.N.Y. June 12, 2019) ("Whereas hostile work environment claims consider the workplace environment as a whole, disparate treatment claims require a tangible, discrete harm such as hiring or discharge.") (citation and quotation marks omitted).

### 1.  Applicable Law Under Title VII and § 1981

To establish a *prima facie* case of a hostile work environment under Title VII the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create

---

[5]  *See* Complaint ¶¶ 75-88 (asserting Title VII and § 1981 claims), ¶¶ 89-96 (asserting claims arising under NYSHRL); Plaintiff's Memo at 25 (hostile work environment under NYSHRL).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981.  Section 1981 has been interpreted to "provide[] a cause of action for race-based employment discrimination based on a hostile work environment" and retaliation.  *See Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015).

an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (citation omitted).

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)) (quotation marks omitted). In determining whether a plaintiff suffered a hostile work environment, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *accord Littlejohn*, 795 F.3 at 321.

As to pervasiveness, "as a general rule, [the offending] incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002); *see Rizzo-Puccio v. Coll. Auxiliary Servs., Inc.*, 216 F.3d 1073 (2d Cir. 2000) ("[I]solated remarks or occasional episodes of harassment do not constitute a hostile environment within the meaning of Title VII.")

It is "axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015). That is, "[t]o establish a hostile work environment, a plaintiff must [] demonstrate that the discriminatory conduct occurred *because of* her membership in a protected class." *White v. Manhattan & Bronx Surface Transit Operating Auth.*, 18-CV-3627 (GBD) (emphasis original), 2022 WL 4227289, at *8 (S.D.N.Y. Sept. 13, 2022) (citing *Alfano*, 294 F.3d at 374) (emphasis added); *see Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether

through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

However, the Second Circuit has "cautioned that a hostile work environment claim need not be supported by direct evidence of explicit ... harassment" based on a protected characteristic as "[c]ircumstantial evidence may do." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014). A plaintiff needs to "show only that 'a reasonable fact-finder could conclude that race [] was *a* motivating factor in the harassment'" not the *only* motivating factor. *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 150 (2d Cir.2003)) (emphasis in original, alteration omitted).

An inference of discriminatory intent may be derived from a variety of circumstances, including, "invidious comments about others in the employee's protected group," "the more favorable treatment of employees not in the protected group," or "the sequence of events leading to the plaintiff's discharge." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Evidence that co-workers or colleagues discussed topics that were "inappropriate "or "otherwise engaged in unprofessional behavior," is insufficient to sustain a hostile work environment claim. *Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 18 (2d Cir. 2009); *accord Chauca v. AdvantageCare Physicians, P.C.*, 18-CV-2516 (BMC), 2019 WL 4247495, at *8 (E.D.N.Y. Sept. 6, 2019). So too, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (citations omitted).

## 2. Hearsay Statements

As an initial matter, "[t]he Court cannot consider hearsay statements on a motion for summary judgment." *Janetos v. Home Dept U.S.A., Inc.*, 09-CV -1025 AKT, 2012 WL 4049839,

at *10 (E.D.N.Y. Sept. 13, 2012) (collecting cases).  Defendant argues that Minerva's comments to "other people" that he observed MLK Day by eating fried chicken and chocolate and Minerva's racial guessing game are both inadmissible hearsay that the Court cannot consider.  Def's Memo at 19; Def's Reply at 6-7; *see* Pl's 56.1 ¶¶ 36, 41.  Defendant points out that Plaintiff has no personal knowledge of these statements.  Rather, Plaintiff only learned of these hearsay statements after Minerva admitted to them in his deposition.  Minerva Dep. 111:19-25 (guessing game) 113:20-114:14 (fried chicken).

Plaintiff contends that such statements are covered under an exception to the Federal Rules of Evidence ("FRE") as an opposing party statement under FRE 801(d)(2)(D) or the residual clause found in FRE 807.  *See* Pl's Opp at 23-24.  Plaintiff's arguments are unavailing.

FRE 801(d)(2)(D) provides an exception to the hearsay rule for statements made by a party's agent or employee, so-called "vicarious admissions."  However, Plaintiffs have not made any showing with respect to the elements of that exception, *i.e.*, (1) the existence of the agency relationship, (2) that the statement was made during the course of the agency relationship, and (3) that it relates to a matter within the scope of the agency.  *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2nd Cir.1992); *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 260-61 (S.D.N.Y. 2003) (Rule 802(d)(1)(D) admissions govern "statements by company officers within the realm of that officer's responsibility and during the existence of the relationship [and] constitute an admission by the employee").  The purpose of such a vicarious admission is to impute statements to the party-employer on the predicate that the employee having made the statements was doing so only in the regular course of their duties owed to their employer.  *See e.g.*, *Pappas*, 963 F.2d at 538 (statements of a declarant who was the agent of a condominium company and whose agency relationship "extended to maintaining" the condo's

25

walkway should have been permitted to testify as to walkway's icy conditions under 802(d)(2));

*Buscemi v. Pepsico, Inc.*, 736 F.Supp. 1267, 1270 (S.D.N.Y.1990) (statements made by the vice-president of personnel on a corporation's hiring and firing practices, printed in a magazine, were 801(d)(2)(D) admissions of the corporation); *SEC v. Credit Bancorp, Ltd.*, No. 99-CV-11395, 2000 WL 968010, at *16 (S.D.N.Y. July 3, 2000) (letter by president of a company on company letterhead constituted company admission).

While Minerva made these statements as an employee of ProHEALTH, Plaintiff fails to establish that they relate to a matter within the scope of Minerva's authorities, *i.e.*, employment duties or actions at ProHEALTH.  Simply put, Minerva's statements about eating fried chicken and playing of the racial guessing game with his other co-workers at unspecified times cannot be construed as part of his duties as a laboratory manager at ProHEALTH or serve the purpose of vicarious admission exception.  The Court will not admit or consider these on this ground.

However, the Court concludes the statements may be considered pursuant to the residual hearsay exception.  Pursuant to FRE 807, a hearsay statement is not excluded by the rule against hearsay if "the statement is supported by sufficient guarantees of trustworthiness" and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807.  "To be admissible pursuant to the residual exception, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991).  On balance, the Court finds that these statements are material and probative to the claims at issue and that admitting them would advance the interests of justice and notice.  Further, Minerva admitted to making these statements under oath and he was available for cross-examination at his Deposition adding to their trustworthiness.  However, as discussed below, they

are of limited value in assessing a hostile work environment claim because there is no evidence Plaintiff was ever aware of the statement and game as she was not present nor had she learned of them during her time at ProHEALTH.

### 3. Analysis

Plaintiff seeks summary judgment on her hostile work environment claim under federal law and the NYSHRL. *See generally* Pl.'s Memo. Defendant also seeks summary judgment on the hostile work environment claim and asserts its affirmative defense under the *Faragerh/Ellerth* doctrine.[6] Def's Reply Memo at 9-10. For the following reasons, the Court concludes that even viewing the facts in the light most favorable to Plaintiff, the record does not support an objective showing of a hostile work environment predicated on "racial enmity" to make out her federal Title VII claim.[7] *Williams v. County of Westchester*, 171 F.3d 98, 100-01 (2d Cir.1999). The Court concludes that ProHEALTH was not "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 309 (2d Cir. 2017).

The gravamen of Plaintiff's claim is that she experienced ProHEALTH as a racially hostile work environment because she was biracial—half Black and half Italian. It is apparent that the primary perpetrators of the racially inappropriate comments and remarks at ProHEALTH were

---

[6] The Supreme Court's *Faragher* and *Ellerth* cases established a federal common affirmative defense for an employer where (1) the employer exercised reasonable care to prevent and promptly correct any race-based harassing behavior, and (2) Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998).

[7] Plaintiff does not claim she faced workplace hostility herself citizenship or religion. Therefore, the Court does not consider those instances such as the tow truck incident—which was based on Plaintiff's perception that she was targeted for potentially being an immigrant—or Minerva's comments on Arab women as relevant to her race-based hostile work environment claim. *See Tolbert*, 790 F.3d at 439.

Plaintiff's supervisor, Minerva, and her co-worker, DeSantis.  Focusing on evidence of incidents that could be inferred by a jury to arise out of "racial enmity," *Williams*, 171 F.3d at 100-01, and that were directed towards Plaintiff, specifically, based on her protected class, *i.e.*, race, the Court is left with the following (disputed) facts:

- That in December 2018, Minerva acted surprised upon meeting Plaintiff at their in-person interview and stated that he was "expecting to see someone who was white," which Minerva disputes saying;

- That, at an unspecified time, Minerva conjectured out loud to a group of ProHEALTH employees, including Plaintiff, that he believed his wife would not want to take a DNA ancestry test because his wife feared discovering that she is Black or otherwise has Black ancestry;

- That, at an unspecified time after January 2020, Minerva told Plaintiff his wife could not cook so she must be Black, which he disputes saying;

- That sometime between January 2020 and June 29, 2020, DeSantis, Dorsainvil, and Plaintiff were discussing a television show which featured the experiences of biracial children and that Dorsainvil recalled that during the conversation DeSantis asked Plaintiff whether she "had experienced anything like that; any horrible experience . . . like that?";

- That at an unspecified time after January 2020 DeSantis called Plaintiff a "freak of nature" and she "must have grown up messed up" and that DeSantis "did not believe in mixing two cultures" while in the Bethpage Lab.

*See generally supra* Part D.

The Court also considers other remarks and conduct that were not directed to Plaintiff but could have "contribute[d] to a hostile work environment." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 267 (2d Cir. 2023) ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment.").

- In 2018, Plaintiff heard Heath read a Black patient's HIV status out loud and that the patient became embarrassed and that she was affected even though the comment was not directed at her; and

- In 2019, Plaintiff overheard DeSantis say to an unspecified patient that "[t]hey have Martin Luther King Day.  What's that about?"

*See supra* Part D.

Even crediting all the disputes in Plaintiff's favor, Plaintiff still has failed to introduce sufficient material facts showing that her work environment was objectively hostile and abusive as Plaintiff's claim fails for both pervasiveness and objective severity.

"As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374 (cleaned up). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* Here, the totality of the circumstances presented establish that these seven racial incidents occurred over a period of nearly two years: from December 2018, when Plaintiff started at ProHEALTH, until late June 2020, just prior to Plaintiff's termination.

Minerva's comments of which Plaintiff could have had knowledge of occurred in 2018 and 2020 and unspecified times in between.  Notably, Minerva was transferred from working at the Bethpage Lab to Lake Success in November 2019 and only sporadically appeared at Bethpage afterward.  DeSantis took a FMLA leave of absence and was not working at the Bethpage Lab from approximately June 29, 2020, to approximately September 9, 2020.  Def's 56.1 ¶ 134.  While Plaintiff details various instances of animosity and combativeness between her and DeSantis— such as the COVID-19 coughing incident that Plaintiff claims was racially-motivated[8] and the

---

[8]  As explained above, there is no evidence beyond Plaintiff's subjective believe that the purported incident was motivated by racial animus.  *See* Schiraldi Dep. 224:5-8.  Moreover, Plaintiff also testified that she did not believe that DeSantis came to work specifically to infect her or other Black people in the workplace.  Schiraldi Dep. 214:16-22.

script throwing incident—the only two race-based comments supported by the record and made by DeSantis and directed toward Plaintiff occurred sometime after January 2020.  Contrary to Plaintiff's contention that ProHEALTH was "replete with racial hostility" Pl's Memo at 14, the facts ultimately adduced do not suffice as a matter of law to establish a pervasive course of conduct. Rather these seven discrete incidents fall on the sporadic side of the spectrum and amount to "isolated incidents of offensive conduct[.]"  *Petrosino*, 385 F.3d 223; *see, e.g.*, *Spina v.  Our Lady of Mercy Med. Ctr.*,  No.? 97-CV-4661 (RCC), 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003) (granting defendants summary judgment where "during the approximately *15 months* during which plaintiff was employed at OLMC, she can positively recall at most, *six specific instances* of harassment" (emphasis in original)), *aff'd*, 120 F. App'x 408 (2d Cir. 2005); *Agosto*, 982 F.3d at 102 (affirming that summary judgment where alleged incidents of harassment occurring over "a few occasions over the course of a year" did not establish objective hostility).

Further, the Court also finds that none of the comments in and of themselves rise to the level of severity required and recognized by courts in this Circuit to transform ProHEALTH into a hostile workplace.  "Title VII [and Section 1981] . . . do[] not set forth a general civility code for the American workplace."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (same).  "[A]n employer has no obligation to insure a pleasant work environment, nor to act on any employee complaint of unfairness or derogatory treatment by co-workers."  *Rivera v. Brooklyn Hosp. Med. Ctr.*, 28 F. Supp. 3d 159, 162 (E.D.N.Y. 2014).

While Minerva's racial comments to Plaintiff about his belief that his wife feared getting a DNA test because she might find out she was Black and his alleged comment equating his wife's poor cooking skills to being Black—which Minerva disputes occurred—were unpleasant and

distasteful, regardless of Minerva's "joking" intention, they do not rise to the level of severity required by courts in this Circuit when assessing hostile work environment claims.[9]  *See, e.g.*, *Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 248 (S.D.N.Y. 2000) (Although plaintiff alleged fifteen incidents of harassment at CCF, only three of the alleged incidents involved racial slurs . . . [and] [a]lthough Zaranski's alleged statement is an explicit and reprehensible racial slur, it cannot—standing alone—constitute the "steady barrage of opprobrious racial comments" necessary to constitute a racially hostile workplace).  For these same reasons, DeSantis' "freak of nature" and biracial TV show comments also do not meet the required severity but are isolated offensive utterances rather than a concerted effort to abuse Plaintiff based on her race.  *See Rivera.*, 28 F. Supp. 3d at 163 (allegations that employee was treated badly by his co-workers through name calling and that he complained about that treatment to his employer did not suffice to establish a hostile work environment claim); *but see Banks*, 81 F.4th at 265 (a jury could find placement of three nooses at or near the workstations of Black employees within the Lockport Plant—even over the course of 11 years—was sufficiently pervasive to support a hostile work environment claim and opining that referring to Black employees as the N-word and "monkey" may also suffice.).

Similarly, Heath's repeatedly saying "HIV" aloud in front of Plaintiff and a Black patient does little to add to an objectively hostile work environment.  While Plaintiff was mortified for the Black patient, she admits that there was no numeric code on the script and paints the racial animus as existing solely because, in her view, Heath should have used code words instead because Heath knew them.  Further, Plaintiff's claim is undercut by the fact that Dorsainvil, another Black employee that was also present, did not consider that action offensive or discriminatory nor did

---

[9] Further, Minerva testified that his wife's views on race did not affect how he supervised Plaintiff or other employees and Plaintiff has not introduced any evidence.  *See supra* Part D.1.(ii)(b).

she ever witness Heath take such allegedly discriminatory actions in the future.  Def's 56. ¶¶ 56-58.  The same can be said for DeSantis' comment about MLK Day.  Plaintiff overheard a racially neutral comment and admitted to not knowing the patient or the patient's race or whether the Patient was offended.  *Id.* ¶¶ 102-05.  Rather, Plaintiff imports her own opinion that it was done in a "questioning" and "racially hostile way."  Pl's Counter 56.1 ¶ 105.  While this is relevant to a subjective analysis it does not move the needle in the objective one.

Lastly, Plaintiff's reliance on Minerva's hearsay admissions, that he and others would guess patients' races and ethnicities when they came into ProHEALTH, and that Minerva would eat fried chicken to celebrate MLK Day, do not advance Plaintiff's claim.  The Second Circuit has opined that "conduct not directly targeted at or spoken to an individual but *purposefully taking place in [her] presence* can nevertheless transform [her] work environment into a hostile or abusive one." *Banks*, 81 F.4th at 262.  Plaintiff has adduced no evidence that these incidents purposefully took place in her presence.  Similarly, as pointed out by ProHEALTH, there is no evidence that Plaintiff became aware of these incidents until *after* Minerva's Deposition.  These incidents are notably absent from Plaintiff's initial complaint and her testimony never establishes that she was aware or present or heard of these things while employed at ProHEALTH.

Looking to the working environment of ProHEALTH as a whole, and even when viewing the record in the light most favorable to Plaintiff, it cannot be said that Plaintiff experienced an objectively severe or pervasive atmosphere of racial hostility at ProHEALTH such that Plaintiff's working conditions were altered during her employment.  Accordingly, Plaintiff's motion for partial summary judgment on her hostile work environment claim is denied, and ProHEALTH's motion for summary judgment on this claim is granted.

32

**B. Plaintiff's Retaliation Claims**

ProHEALTH also moves for summary judgment on Plaintiff's retaliation claims based on §
1981, Title VII, and NYSHRL. Def's Memo at 8-10.

**1. Applicable Law**

"A claim for retaliation under Title VII is governed by the burden-shifting analysis laid out
in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Arroyave v. Universal Remote
Control, Inc.*, 20-CV-8040 (VB), 2023 WL 5983941, at \*10 (S.D.N.Y. Sept. 14, 2023) (citing *Chen
v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)). To establish a *prima facie* case of retaliation,
the plaintiff must show that: "(1) she engaged in a protected activity; (2) her employer was aware
of this activity; (3) the employer took adverse employment action against her; and (4) a causal
connection exists between the alleged adverse action and the protected activity." *Id.* More
specifically, with respect to causation, a Plaintiff must establish that retaliation for her protected
activity was a "but-for" cause of her termination, "not simply a 'substantial' or 'motivating' factor
in the employer's decision." *Villetti v. GuiDepint Glob. LLC*, 21- CV-2059, 2022 WL 2525662, at
\*4 (2d Cir. July 7, 2022) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir.
2013)) (quotation marks omitted).

"Once a prima facie case of retaliation is established, the burden of production shifts to the
employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action."
*Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If the employer demonstrates a
legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish,
through "either direct or circumstantial evidence, that the employer's action was, in fact, motivated
by discriminatory retaliation." *Id.*

33

As a threshold matter, here, there is no question that Plaintiff's termination suffices as an adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.").

"[A]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Rivera*, 743 F.3d at 25.

### 2.   Analysis

ProHEALTH contends that Plaintiff's retaliation claim in connection with her termination fails because she did not engage in legally cognizable protected activity; that there is no evidence of a causal connection; and, that Plaintiff's termination legitimate because it arose out of her September 2020 incident with DeSantis.  The Court addresses each contention in turn.

### a.   Protected Activity

"To establish that his activity is protected under Title VII, a plaintiff need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) ("[T]o be actionable under § 1981, the retaliation must have been in response to the plaintiff's assertion of rights that were protected by § 1981").

 However, complaints of unfair treatment or "generalized grievances about an unpleasant or even harsh work environment, without more ... fail to rise to the level of protected activity." *Green v. Mount Sinai Health Sys., Inc*., 826 F. App'x 124, 125 (2d Cir. 2020) (summary order).

"The onus is on the speaker to clarify to the employer that [she] is complaining of unfair treatment due to [her] membership in a protected class." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009).

Plaintiff alleges she made four internal complaints: (1) a January 30, 2020 internal complaint to Minerva regarding the tow sticker; (2) a March 2020 internal complaint to Vathis regarding COVID-19 masking and guidelines; (3) a September 2020 statement to her supervisor, Mcleod, that Minerva and Heath were allegedly "racists;" and (4) an October 5, 2020 post-termination complaint regarding alleged threats of violence made against Plaintiff during her employment. *See* Pl's 56.1 ¶¶ 61, 110, 120, 171.

Viewing the record in the light most favorable to Plaintiff and in the context of her race-based retaliation claims, her informal conversation with her supervisor McLeod in the summer of 2020 relating that (a) she felt as though Minerva was a racist and that (b) Minerva told her the only reason why he called her for an interview was because he thought Plaintiff was white, may be construed as protected activity by a reasonable juror. *See Gonzales v. Eagle Leasing Co.*, 3:13-CV-1565 JCH, 2015 WL 4886489, at *6 (D. Conn. Aug. 14, 2015) ("The record contains evidence that Gonzales, through Pedras, accused Louis Eagle of being prejudiced and racist. Complaining about racial discrimination is certainly a protected activity." (internal citation omitted)); *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) (explaining that "for the purposes of establishing a retaliation claim, the Second Circuit recognizes both formal and informal complaints as protected activity"); *Sumner*, 899 F.2d at 209 (Title VII "protects as well informal protests of discriminatory employment practices, including making complaints to management").

However, Plaintiff's other alleged forms of protected activity are unavailing. As to the tow sticker incident, it is clear that some unknown person placed a "bogus" tow sticker on her car that shared a lot with the DMV. Plaintiff left work and drove home, and it was Minerva who contacted Plaintiff about the incident. During their phone conversation, Plaintiff did not mention race or other prohibited conduct to Minerva. At most, any putative comment by Minerva that a "vigilante" placed the sticker, was made by *him* not by Plaintiff, and raises only an inference about a complaint relating to Plaintiff's immigration status, not her ace.

As to the COVID-19 masking complaint, "Title VII does not prohibit unsafe or dangerous working conditions, so complaints about such conditions are not a 'protected activity' under the statute." *Gonzales*, 2015 WL 4886489, at *6 (citing *Rodriguez v. Beechmont Bus Serv., Inc.*, 173 F.Supp.2d 139, 150 (S.D.N.Y.2001)). Lastly, Plaintiff's final complaints during her termination call were made after she had already been terminated by ProHEALTH, it would have been impossible for such otherwise protected activity to have caused her termination which had already been decided on and transmitted to Plaintiff on the call.

### b.     Causation & Legitimate Grounds for Termination

For purposes of a retaliation claim, causation can be established: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d. Cir 2000). Moreover, the plaintiff must establish "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Thus, "Title VII retaliation claims require proof that the desire to

retaliate was the but-for case of the challenged employment action." *Lively v. WAFRA Inv. Adv. Grp.*, 6 F.4th 293, 304 (2d Cir. 2021). However, but-for causation does not "require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (quoting *Zann Kwan*, 737 F.3d at 846).

Temporal proximity between the adverse action and the protected activity may be sufficient to establish a prima facie element of causation on its own. *Parron v. Herbert*, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order). But "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Chung v. City Univ. of New York*, 605 F. App'x 20, 23 (2d Cir. 2015) (summary order).

Plaintiff cannot establish that her only instance of protected activity in the summer of 2020, when she informally complained to McLeod about "racists" at ProHEALTH, was a but-for cause of her termination in October 2020, or that any sort of racial animus was a motivating factor in her termination.

First, the temporal distance between Plaintiff's complaint to McLeod and Plaintiff's termination weakens any causal connection. *Yoselovsky v. Associated Press*, 917 F.Supp.2d 262, 278 (S.D.N.Y.2013) (listing cases in which comments made four to five months prior to the plaintiff's termination did not constitute evidence of discrimination); *Callistro v. Cabo*, 11-CV-2897, 2013 WL 322497, at *7-8 (S.D.N.Y. Jan. 25, 2013) (finding that a four month gap was too long for discriminatory remarks to indicate that the defendants terminated plaintiff with discriminatory intent, where there was no evidence that discriminatory remarks were made in relation to the termination decision); *Buckman v. Calyon Sec. (USA), Inc.*, 817 F.Supp.2d 322, 335-

36 (S.D.N.Y. 2011) (holding that an inappropriate comment that was unconnected to the plaintiff's discharge and made five months prior to termination was "too remote in time and context" to support plaintiff's discrimination claim); *Del Franco v. N.Y.C. Off-Track Betting Corp.*, 429 F.Supp.2d 529, 537 (E.D.N.Y. 2006) (finding no temporal connection where "slightly more than three months" elapsed between the alleged discriminatory remarks and the plaintiff's termination), *aff'd*, 245 Fed. App'x. 42 (2d Cir. 2007).

Of course, "[w]here the facts indicate that a lengthy lapse represent[s] an employer 'waiting for the opportune time to retaliate,' a retaliation claim may proceed despite the lack of temporal proximity." *Skrine v. City of New York*, 22-CV-04022 (OEM) (JRC), 2024 WL 3938004, at *3 (E.D.N.Y. Aug. 26, 2024) (quoting *Sosa v. New York City Dep't of Educ.*, 18-CV-411(PKC)(SJB), 2020 WL 1536348, at *6 (E.D.N.Y. Mar. 31, 2020)).  But no such circumstances are present here. Minerva, a prime perpetrator of the racially charged workplace comments made years prior, had been transferred from Bethpage Lab at the time of Plaintiff's informal complaints of racism to McLeod.  McLeod Dep. 134:12-142:5.  Plaintiff raises no instances or inferences of pretext that McLeod or other authority figures at ProHEALTH were waiting for an opportune moment to retaliate against Plaintiff by terminating her based on these complaints, much less that they thought ill of her because of her race.  Indeed, the record indicates that Plaintiff confided in McLeod about racist conduct at ProHEALTH, as she was also a woman of color.  *See* Schiraldi Dep. 117:12-121:22; McLeod Depo 134:12-142:5.  Moreover, neither McLeod, nor McLeod's own supervisor, Nilsa Banks, had input into the decision to terminate Plaintiff's employment.  Def's 56.1 ¶ 168. Rather, it was Teemsma and Giambalvo who investigated the incident with DeSantis, compiled their findings, and recommended that Plaintiff be terminated.

Ultimately, the evidence adduced establishes that a formal investigation was initiated after the September 29, 2020, incident in which Plaintiff physically threatened DeSantis and this threat was corroborated twice by Dorsainvil.  Such a threat violates ProHEALTH's Violence Free Workplace policy, which Plaintiff was aware of.  Importantly, neither Teemsma nor Giambalvo, the HR investigators, were aware of Plaintiff's race during the investigation nor before their recommendation to Bierman that Plaintiff be terminated.  Def's 56.1 ¶ 163.  Bierman, the final decisionmaker in terminating Plaintiff, also was not aware of Plaintiff's race.  Def's 56.1 ¶ 169.  The investigation was focused solely on the physical threats made by DeSantis, not any race-based conduct.  *See* LG Memo.  The investigators took statements from the witnesses and interviewed Plaintiff, who did not raise any complaint or inferences regarding racial discrimination or retaliation.  Def's 56.1 ¶ 156; Giambalvo Dep. 272:11-22..  The investigation was corroborated by Dorsainvil who twice affirmed that Plaintiff made the physical threat.  *See* LG Memo.  It was not until Plaintiff received word of her termination that Plaintiff raised other complaints.  However, the evidence shows that the only complaints to ProHEALTH management involved threats of violence and Plaintiff only points to her own self-serving deposition testimony.  *See id.*  Even if Plaintiff had made complaints about other employees' racism at that time, the termination decision had been made entirely without that consideration.

Plaintiff's "cat's paw" theory of causation is also unavailing.[10]  Plaintiff argues that "her termination would not have occurred, absent Defendant's decision to credit DeSantis' false

---

[10]  The "cat's paw" metaphor now "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (citation omitted).

narrative over all contradictory evidence because [DeSantis] is white." Pl's Opp. at 20-22.  The

Second Circuit has explained that under a cat's paw theory may be successful only when:

> an employer in effect adopts an employee's unlawful animus by acting *negligently*
> with respect to the information provided by the employee, and thereby affords that
> biased employee an outsize role in its own employment decision, can the
> employee's motivation be imputed to the employer and used to support a claim
> under Title VII. Put simply, an employer can still "just get it wrong" without
> incurring liability under Title VII . . . but it cannot "get it wrong" without recourse
> if in doing so it negligently allows itself to be used as conduit for even a low-level
> employee's discriminatory or retaliatory prejudice.

*Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275-76 (2d Cir. 2016).

The record is devoid of DeSantis having any role, much less an "outsize[d]" one, in

Plaintiff's termination.  Rather, the record establishes that DeSantis was on the receiving end of a

verbal threat made by Plaintiff; DeSantis reported that threat to her supervisors and felt genuinely

afraid for her safety.  Plaintiff adduces no evidence showing that DeSantis had any communication,

or unofficial authority or sway with Teemsma, Giambalvo, or Bierman such that any racial animus

purportedly harbored by her against Plaintiff motivated ProHEALTH to terminate Plaintiff.  *See,*

*e.g.*, *Braunstein v. Sahara Plaza, LLC*,  16-CV-8879 (VSB), 2021 WL 2650369, at *14 (S.D.N.Y.

June 28, 2021) (Granting summary judgment for defendant where nothing in the record suggests

co-workers involvement in the performance review or the ultimate termination of plaintiff's

employment, nor is there any evidence of manipulation by any of the co-workers who made

complaints about plaintiff.), *aff'd*, 21-CV-2030, 2022 WL 17480962 (2d Cir. Dec. 7, 2022).

Because the Court concludes that ProHEALTH had a legitimate, non-pretextual reason for

terminating Plaintiff, which was not informed in any way by DeSantis' purported racial animus

against Plaintiff, the Court grants summary judgment to ProHEALTH on the retaliation claims.

**C. Plaintiff's State Law Claims**

Plaintiff also brings claims for a hostile work environment and retaliation under the NYSHRL.  However, the Court declines supplemental jurisdiction over these state law claims and thus need not reach the merits of these claims.  *See Barbara Tillman v. Grenadier Realty Corp. & GRC Management*, No. 21-CV-4827 (KAM)(MMH), 2024 WL 3758803, at *14 (E.D.N.Y. Aug. 12, 2024) (Where "claims are before the Court solely through its supplemental jurisdiction—and the Court has granted summary judgment to on Plaintiff's federal claim" a court may decline to reach the merits of the state law claim.).

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment with respect to the Title VII claims is **GRANTED**, Plaintiff's motion for partial summary judgment is **DENIED**, and the Court declines to reach the merits of Plaintiff's state law claims.  Therefore, the Complaint is **DISMISSED** in its entirety.  The Clerk of Court is directed to enter judgment and close this case.

**SO ORDERED.**

/s/ Orelia E. Merchant
ORELIA E. MERCHANT
United States District Judge

Dated: September 20, 2024
Brooklyn, New York

41